IN THE MATTER OF THE ESTATE OF BELINDA WATSON,
DECEASED.

Hudson County Court
Probate Division

Decided November 15, 1960.

*Mr. John D. McMaster,* attorney for William E. Decker, administrator *c. t. a.* (*Mr. James D. Carpenter,* on the brief).

*Mr. Joseph Keane,* general administrator, *pro se.*

Rosen, J. C. C. The Surrogate of Hudson County, on July 14, 1960, appointed William E. Decker, a member of the New Jersey Bar, as administrator *c. t. a.* of the will of Belinda Watson. On August 26, 1960 he appointed Joseph Keane, a member of the New Jersey Bar, as general administrator of the estate of the said Belinda Watson.

Evelyn A. Mace, niece of Belinda Watson, deceased, and William E. Decker, brought this action to vacate and set aside the appointment of Joseph Keane as general administrator of decedent's estate. Joseph Keane seeks to vacate the appointment of William E. Decker as administrator *c. t. a.*

On July 2, 1960 the decedent, Belinda Watson, executed her last will and testament, wherein she gave specific instructions concerning her debts, funeral arrangements, and funeral expenses. Decedent died on July 4, 1960. She devised her home and its entire contents in Jersey City

to her neighbors, Frank J. Doyle and Elizabeth R. Doyle, his wife. The will does not dispose of her residuary estate, nor did she appoint an executor in the said will. The probate of the will is not in dispute. However, examination of the original will discloses that it was typed as the will of Linda Watson. It appears that the letters "Be" were inserted in ink in front of the name "Linda" wherever the name appeared on the face of the will. The writing represented to be the signature of Belinda Watson discloses an obviously weak signature, which is hardly legible. This writing appears four times on the face of the will.

The decedent was 86 years of age and was confined to a nursing home when the will was executed. Mr. Doyle, an insurance underwriter, and his wife were neighbors of decedent. They paid a great deal of attention to her and were one of her sources of satisfaction and happiness. The decedent had a great deal of faith in Mr. Doyle during her lifetime, and he handled her bank accounts, prepared checks for her signature, made arrangements to have her income tax returns filed, and, generally, was a confidant in whom decedent placed a great deal of trust. Decedent's husband died about 15 years prior to her death, and her relatives did not visit her after his death. Sometime in June 1960 Mr. Doyle spoke with Mrs. Watson at the nursing home. She requested that he bury her and take care of the bills. She wanted Mr. and Mrs. Doyle to have the house. Mr. Doyle advised her he could not abide by any of her decisions without "getting it down on paper," and he suggested the services of an attorney be obtained. Apparently, in this discussion with decedent, she remembered the name of Mr. McMaster.

Mr. Doyle communicated with Mr. McMaster's office and was informed that Mr. McMaster was on vacation. He was referred to Mr. Decker. Mr. Decker saw decedent on June 13, 1960. Decedent informed Mr. Decker that she wanted to make a will, provide for funeral arrangements, and designate an undertaker to conduct her funeral. She

also advised Mr. Decker that her next-door neighbors, the Doyles, had done many things for her, and she wanted to leave them her house on Fairmount Avenue, Jersey City, together with its contents. Mr. Decker asked her what disposition she wanted to make of the rest of her property, and she replied she wanted to think it over. Mr. Decker had no idea of the value of her estate, but assumed she was "paying a good weekly charge" in the nursing home and that she did have other property. Further inquiry by Mr. Decker revealed that she had relatives but did not have much to do with them, and had no desire to leave any money to any charitable or religious institutions. At this conference she asked for Mr. Doyle, and was told Mr. Doyle did not understand he was to attend. Decedent then asked when Mr. McMaster would return, and when informed about three weeks or longer, she said she wanted to see Mr. Doyle. Decedent, in response to Mr. Decker's inquiry, stated "I don't want any executor right now." She was then advised the surrogate would appoint an administrator if she did not appoint an executor in her will. She responded by saying "I want to talk to Mr. Doyle." This conference, which lasted 1 to 1½ hours was the only time Mr. Decker spoke to or saw decedent.

Mr. Doyle visited decedent and communicated with Mr. Decker. Mr. Decker prepared the will and gave it to Mr. or Mrs. Doyle with a sheet of instructions on how it should be signed. He was not present when the will was executed. Mr. Decker was informed that decedent had one relative in Jersey City, and the rest of her relatives lived in England, Ireland or Scotland. Evelyn Mace, niece of decedent, is the relative who resided in Jersey City. Mr. Decker states he was appointed administrator c. t. a. at the request of Mrs. Mace, Mr. and Mrs. Doyle, and Mr. Allen. However, at the time the complaint was filed in the surrogate's office requesting the will to be admitted to probate, and asking for letters of administration c. t. a., the only renunciations submitted and filed were those of Evelyn A. Mace, Frank J.

Doyle and Elizabeth R. Doyle. Mr. Decker testified that as soon as the ten-day period had expired, he offered the will for probate, *before he obtained any other renunciations.* He states the reason for this action was caused by Mr. Doyle's knowledge that decedent had given him (Mr. Doyle) a sealed envelope, a month or two prior to her death, which was put in a tin box in the desk of her house. Mr. Doyle thought the envelope might contain securities. Thereafter, securities, bank books, etc., were found, amounting to approximately $500,000.

On July 20, 1960 Mr. Decker filed a petition for permission to make deposit of funds in lieu of providing full security, and to designate an approved national bank in accordance with *N. J. S.* 3A :7–10. On said date, the surrogate signed an order directing the deposit of securities, and designating the First National Bank of Jersey City as custodian of the securities. Pursuant to this order, Mr. Decker made several deposits of securities with the designated bank. The last deposit was August 25, 1960. Mr. Decker, as administrator *c. t. a.*, filed a New Jersey inheritance tax return, preliminary federal tax notice, paid bills, and obtained an order barring creditors. The New Jersey inheritance tax report discloses that Mr. Decker requested $30,000 as commission, and $20,000 in fees for his attorney, John D. McMaster.

Mr. Decker and Mr. McMaster had a discussion with the Surrogate of Hudson County concerning the appointment of a general administrator. The surrogate believed that the personal estate of decedent should be administered by a person other than Mr. Decker as administrator *c. t. a.* The position of Mr. Decker was that he had practically completed the estate, and as administrator *c. t. a.* he had the right to administer the personal estate without the appointment of a general administrator. However, if one was required, he would obtain renunciations from all heirs and next of kin. The surrogate did not agree with his contention and appointed Mr. Keane on August 26, 1960.

The inheritance tax report, which was signed by Mr. Decker, contained a rider as follows:

"Belinda Watson, deceased, was a native of Ireland. Deponent knows that she has several brothers and sisters. One of her sisters is still alive and the families of the deceased brothers and sisters, who live in Ireland or England, having not been able to get any information up 'til this time. All the information we have up to this time is in Schedule E of the report. It will be necessary to conduct a proceeding to determine who the heirs at law and next of kin of the deceased are. That proceeding cannot be conducted until after the final account is filed."

The will of Belinda Watson, which was probated by the surrogate on July 14, 1960, was an incomplete will. It failed to name an executor and there was no provision for the disposition of decedent's residuary estate. On July 14, 1960 Mr. Decker filed a complaint seeking the probate of the will and appointment as administrator *c. t. a.* His complaint recited that there were seven heirs and next of kin of decedent. Mr. and Mrs. Frank J. Doyle were specific legatees in the will. At the time this application was made to the surrogate there was only one renunciation filed by decedent's relatives, that of Evelyn A. Mace. The other renunciation was from the Doyles. These renunciations requested that Mr. Decker be appointed administrator of the estate. The surrogate, on said date, signed a judgment admitting the will to probate, and issued letters of administration *c. t. a.* to William E. Decker. The surrogate's certificate recites "* * * and that William E. Decker, Administrator *C. T. A.*, is duly authorized to take upon himself the administration of the estate of the said testatrix agreeable to said will." *Civil Procedure Form* 44(c).

On July 28, 1960 James Geddes Allen, nephew of decedent, residing in California, signed a renunciation requesting Mr. Decker be appointed administrator *with the will annexed.* Annie E. Metzler, niece of decedent, residing in New York, signed a renunciation dated the ——— day of July, 1960, acknowledged July 29, 1960. She requested Mr. Decker to

be appointed administrator *c. t. a.* The renunciation of another niece, Florence E. Metzler, New York, dated the ——— day of July, 1960, acknowledged July 29, 1960, requested Mr. Decker to be appointed administrator *with the will annexed.* The renunciation of Lilly Allen Powell, sister of decedent, who resides in Ireland, was signed August 16, 1960. This renunciation requested Mr. Decker be appointed administrator. These four renunciations were filed with the surrogate on August 23, 1960.

This is the factual situation which existed on August 26, 1960 when Mr. Keane was appointed general administrator of the estate. His complaint for letters of administration did not mention any heirs or next of kin, but did state "all next of kin have filed renunciations with the surrogate." Apparently, as of this date, there were still two known heirs at law, Molly Allen, a niece, and Iver Allen, a nephew, both of England, who had not filed renunciations. There is no record in the surrogate's office nor is there any testimony that the known heirs and next of kin who did not sign renunciations had been served with notice of Mr. Decker's or Mr. Keane's application for appointment as administrator *c. t. a.* and general administrator, respectively. The surrogate's records also fail to disclose the filing of an affidavit of inquiry, as required by *R. R.* 4:99–3(*c*).

There was no reference to surrogates in the *Constitution of 1776,* although there was a provision (sec. VIII) which declared "that the Governor be Ordinary or Surrogate General." The surrogates were appointed by the Governor as deputies subject to the control and supervision of the Ordinary, and to be removed at his pleasure. By the appointment of surrogates, the Ordinary did not curtail his own jurisdiction. The Ordinary retained jurisdiction of all cases. The surrogate, acting as his deputy, also had jurisdiction of all cases submitted to him unless some special restriction was inserted in his commission. Although surrogates were unknown to the *Constitution of 1776,* they were frequently recognized by acts of the Legislature.

Chancellor Pennington, as Ordinary in 1843, clearly stated the origin of the power of the Ordinary or Surrogate General for the probate of wills, and likewise sketched the origin and power of surrogates. *In re Coursen's Will,* 4 *N. J. Eq.* 408 (*Prerog.* 1843). See *In re Thompson,* 85 *N. J. Eq.* 221, 261 (*Ch.* 1915).

The *Constitution of* 1844 (*Art.* VII, § 2, *par.* 5) made the surrogates of counties constitutional officers. The duties of the surrogate were not defined by this constitutional provision but remained such as were prescribed by statute. A similar provision in the *Constitution of* 1947 continues the surrogate as a constitutional officer (*Art.* VII, § 2, *par.* 2). ■ Although the surrogate of the county, in probating a will, acts judicially and holds a court, his jurisdiction is limited. The surrogate's court has been called a court of "peculiar jurisdiction." *Steele v. Queen,* 67 *N. J. L.* 99, 100 (*Sup. Ct.* 1901). The surrogate's court has been referred to as a court of limited and special jurisdiction, while the County Court is a court of limited and general jurisdiction. 7 *N. J. Practice* (*Clapp, Wills and Administration*), § 989, *p.* 602 (1950).

The authority of the surrogate to issue letters of administration is found in *N. J. S.* 3*A*:6-4.

*"Letters of Administration; to whom granted*
If any person dies intestate, administration of the personal estate of such intestate shall be granted to the surviving spouse of such intestate, if he or she will accept the same, and, if not, or if there be no such person, then to the next of kin of such intestate, or some of them, if they or any of them will accept the same, and if none of them will accept the same, then to such other proper person as will accept the same.
If such intestate leaves no relations justly entitled to the administration of his personal estate, or if his next of kin shall not claim the administration within 40 days after the death of such intestate, the superior court, or surrogate's court, may grant letters of administration to any fit person applying therefor."

A complaint for letters of administration must comply with the requirements of *R. R.* 4:99-1:

"The action for probate of a will, for letters of administration, letters of administration with the will annexed, letters of substitutionary administration with the will annexed, shall be commenced by filing a complaint, stating:

(a) The plaintiff's residence;

(b) The name and date of death of the decedent, his domicile at his death and date of his will, if any;

(c) The names and addresses of his spouse, heirs, next of kin, and other persons, if any, entitled to letters, and their relationships to him, and to the best of the plaintiff's knowledge and belief, identifying any of them whose names are unknown and stating further that there are no other heirs and next of kin, or as the case may be; * * *"

*R. R.* 4:99–3 provides, *inter alia,* as follows:

"If the application for the letters specified in Rule 4:99–1 is made by the person first entitled thereto, no renunciation or notice shall be required; but if the application is made by any other person, the plaintiff shall file:

(a) The renunciation of all competent adult persons whose right to the letters is prior or equal to that of the person seeking letters, which renunciations shall contain a request that the letters issue according to the application; or

(b) Proof that at least 10 days' notice of the application has been given to all such persons residing in the State who have not renounced, and that 60 days' notice, or such notice not less than 10 days in length, as the court may by order direct, has been given to all of them who reside without the State. If in an action for letters of administration with the will annexed, it appears that the decedent left a will naming an executor who has not renounced, proof shall be submitted showing that like notice has been given to him. Notice to a resident or nonresident of the State may be served as a summons is required to be served or may be sent by registered or certified mail, return receipt requested, to his last known address.

(c) Where the names or addresses of any of the persons referred to in paragraph (a) are not known, then an affidavit of inquiry as to such names or addresses, which affidavit and inquiry shall be made as required by Rule 4:4–5(b)."

*R. R.* 4:99–3 is made applicable to the surrogate's court by *R. R.* 5:4–1.

The genesis of *N. J. S.* 3*A*:6–4 is found in the 28th section of the Orphans Court Act, *L.* 1898, *p.* 724. *Rules* 1 and 2 of the Orphans Court made by the Ordinary pursuant

to *section* 194 of the Orphans Court Act, *L.* 1898, *p.* 788, was the forerunner of our present *R. R.* 4:99–3. In discussing the then existing comparable statute and rules, the Court of Errors and Appeals unanimously affirmed an opinion in the Orphans Court which held:

"These rules are as binding as the statute, must be complied with, and a *valid grant of administration cannot be made* without such compliance. *Gans v. Dabergott,* 40 *N. J. Eq.* 184, 187; *Sayre v. Sayre,* 48 *N. J. Eq.* 267, 269. * * * The rule of the surrogate that administration will not be committed to a non-resident cannot justify failure to comply with the requirements of the above rules. * * * My conclusion, therefore, is that the grant of letters to Herzich was without warrant in law, and that the same should be revoked. * * *." *In re Sinovcic,* 80 *N. J. Eq.* 260, 262, 263, 265 (*E. & A.* 1912). (Emphasis added)

*Dickerson v. Camden Trust Co.,* 140 *N. J. Eq.* 34, 53 (*Ch.* 1947), is apposite.

 It is uncontroverted that at the time Mr. and Mrs. Doyle signed the renunciation, they were not informed of their right to seek appointment by the surrogate as administrator *c. t. a.* of the estate, nor were they informed of the benefits accruing therefrom. A renunciation is analogous to or constitutes a waiver by a person who possesses a claim or right. However, a waiver, to be effective, must be an intentional relinquishment of a known right, and unless a person is informed of his right, it cannot be said such person clearly, intentionally and understandingly waived such right. There is serious doubt that Mr. and Mrs. Doyle's renunciation is valid.

 When an application is made by a non-relative, the mandatory prerequisites to invoke the surrogate's jurisdiction to issue letters of administration are: (1) the renunciation of *all* competent adult persons whose right to the letters is prior or equal to that of the person seeking letters, which renunciations shall contain a request that the letters issue according to the application (*R. R.* 4:99–3(*a*)); (2) if all the renunciations are not obtained, notice of the application

for letters of administration must be given to such persons who have not renounced, whether residents or non-residents (*R. R.* 4:99–3(*b*)); (3) where the circumstances necessitate inquiry, the filing of an affidavit required by *R. R.* 4:99–3(*c*). Failure to obtain renunciations from *all* the next of kin or failure to give notice pursuant to the rules of court will not only constitute reversible error but also grounds for re-opening the judgment granting letters even though such failure was unintentional. *In re Fischer's Estate*, 118 *N. J. Eq.* 599 (*Prerog.* 1935); 6 *N. J. Practice* (*Clapp, Wills and Administration*), § 374, *p.* 239 (1950).

The facts before the court disclose a dispute or doubt between the administrator *c. t. a.*, the general administrator and the surrogate. As soon as the dispute or doubt arose before the surrogate, he lost jurisdiction over the subject matter. The jurisdiction to hear and determine disputes or doubts arising before the surrogate or in the surrogate's court is in the County Court. The surrogate has no authority to take any further action except in accordance with the order of the County Court. *N. J. S.* 3*A*:2–5, *N. J. S.* 3*A*:2–3.

At the time Mr. Decker filed his complaint for letters of administration *c. t. a.* only one renunciation of an heir or next of kin was obtained and filed. No notice was given to the remaining heirs or next of kin who did not file renunciations. While the affidavit of Mrs. Mace, which is annexed to her application, states there are other relatives of decedent whose names and places of residence are not known to her, there is no mention of such facts in the complaint for letters of administration. This information was available because Mr. Decker and Mrs. Mace conferred with each other immediately after Belinda Watson's death. On July 14, 1960, when Mr. Decker applied to the surrogate for administration, he did not obtain "any other renunciations" because he wanted "to find out what was in the envelope" (referring to the envelope decedent gave Mr. Doyle which was in a desk in decedent's home). While this was

Mr. Decker's expressed purpose, suffice to say, good intentions cannot be substituted for compliance with the rules of court. This is a classic case where application should have been made to the County Court for a limited or temporary administration. Such procedure would have given interested parties an opportunity to obtain renunciations from all adult heirs and next of kin, or give notice of application for letters or administration; also to make inquiry and file an affidavit as required by *R. R.* 4:99–3. The County Court has jurisdiction to grant temporary or limited administration. *N. J. S.* 3*A*:6–14, *R. R.* 4:99–8.

When the surrogate appointed Mr. Keane general administrator all of the renunciations of the heirs and next of kin had not been obtained and there was no proof of notice to interested parties. Admittedly, his appointment was made *ex parte.* On August 26, 1960 the surrogate could not make a valid grant of administration to Joseph Keane as general administrator because (1) there was a failure to comply with the provisions of *R. R.* 4:99–1, 4:99–3, *In re Sinovcic, supra;* (2) the County Court and not the surrogate's court has jurisdiction to hear and determine disputes or doubts arising before the surrogate or surrogate's court. *N. J. S.* 3*A*:2–3, 3*A*:2–5; *R. R.* 5:3–3(*a*) (4–5). The letters of general administration granted to Joseph Keane by the surrogate were without warrant in law, and the same are revoked.

Mr. Decker asserts that the judgment appointing him administrator *c. t. a.* cannot be reviewed in these proceedings. This court has jurisdiction to determine the validity of the surrogate's judgment granting letters of administration *c. t. a.* to him. This jurisdiction is conferred by *N. J. Const.* 1947, and *Title 3A* of the *Revised Statutes.* The *Constitution* provides:

"The County Courts, in civil causes including probate causes, within their jurisdiction, and subject to law, may grant legal and equitable relief so that all matters in controversy between the parties may be completely determined." (*Art.* VI, *Sec.* IV, *par.* 5)

"The jurisdiction, powers and functions of the County Courts and of the Judges of the County Courts may be *altered by law* as the public good may require." (*Art.* VI, *Sec.* IV, *par.* 4) (Emphasis added).

Pursuant to this constitutional authorization, the Legislature enacted *N. J. S.* 3*A* :2–2 :

"The County Court of each county shall have full authority to hear and determine all controversies respecting wills, inventories, administration and guardianship, and full authority over the accounts of executors, administrators, guardians and trustees, as directed in this Title 3A and also authority over all other matters and things as are submitted to its determination in said title."

Judge (now Justice) Francis has clearly and succinctly set forth the objectives of the cited constitutional provisions:

"One of the major objectives of the 1947 Constitution was to permit and in fact to require where possible, the complete determination of the controversy between the parties by the court which first properly obtained jurisdiction over the dispute between them. *Sciarrotta v. Vitellaro*, 43 *N. J. Super.* 32 (*App. Div.* 1956) ; *In re Opper's Estate*, 29 *N. J. Super.* 520 (*App. Div.* 1954) ; *Tumarkin v. Friedman*, 17 *N. J. Super.* 20 (*App. Div.* 1951) ; certification denied 9 *N. J.* 287 (1952). In recognition of this aim, the Supreme Court * * * held that once the jurisdiction of the County Court has been properly invoked, whatever relief is necessary, legal and equitable, may be granted in order to dispose of the matters in controversy. * * * This language has been interpreted sensibly to mean that once a cause of action lying within the statutory jurisdiction of the County Court is presented to it, all other matters in controversy between the parties may be tacked to that proceeding. 7 *N. J. Practice* (*Clapp, Wills and Administration*), *section* 990, at 604 (1950)." *In re Koehler's Estate*, 43 *N. J. Super.* 585, 597 (*App. Div.* 1957).

This court "first properly" obtained jurisdiction over the controversy between the administrator *c. t. a.*, the general administrator, and the surrogate. The basic problem is not the probate of the will, but who should administer the estate of Belinda Watson. To deny the jurisdiction of this court to determine that question would be to frustrate the very object which the new judicial system was designed to accomplish. The adjudication of this entire controversy is

well within the court's constitutional and statutory orbit. *In re Koehler's Estate, supra,* at *p.* 598.

The surrogate was without jurisdiction to make a valid grant of administration to Mr. Decker as administrator *c. t. a.* because there was a failure to comply with the provisions of *R. R.* 4:99–1, 4:99–3. The surrogate's judgment, dated July 14, 1960, granting letters of administration *c. t. a.* to Mr. Decker is void, and the letters are revoked. *In re Sinovcic, supra; Dickerson v. Camden Trust Co., supra; In re Fischer's Estate, supra;* 6 *N. J. Practice (Clapp, Wills and Administration),* § 374, *p.* 239.

The facts in this case afford a proper basis for the appointment of a fit person to administer the estate. *N. J. S.* 3A:6–4. *Simoni v. D'Ippolito,* 8 *N. J.* 271, 278 (1951), *certiorari* denied 343 *U. S.* 928, 72 *S. Ct.* 761, 96 *L. Ed.* 1338 (1951).

"* * * When the matter of the granting of letters of administration is once properly before the court it may appoint any person, individual or corporate, legally entitled to same and possessing the necessary qualifications therefor. The right to administration is personal in the next of kin, and if they fail to apply for or waive it in favor of some one else, it is for the court to appoint, in its discretion, such proper person as will accept it. *In re Cresse,* 28 *N. J. Eq.* 236 (*Prerog.* 1877); *Cramer v. Sharp,* 49 *N. J. Eq.* 558, 561 (*Prerog.* 1892)."

See also *In re McFeely's Estate,* 10 *N. J.* 133, 136, 137 (1952).

Mr. Frank J. Doyle was held in high regard and esteem by decedent. She placed her confidence and trust in him. His actions bespeak fidelity to this trust. He has the knowledge of this estate and the ability to serve.

The court will appoint Frank J. Doyle and John Drewen, Esq. as co-administrators *c. t. a.* and also general co-administrators of the estate of Belinda Watson. In making these appointments the court is satisfied that the estate of Belinda. Watson will be administered efficiently and economically.

The surrogate is ordered and directed to issue letters of administration in accordance with this opinion.